# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| George K. Baum Advisors, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11-cv-2442 WEB/KMH |
| v. | ) | |
| | ) | |
| Sprint Spectrum, L.P., | ) | |
| **Serve through its registered agent:** | ) | |
| **The Prentice-Hall Corporation** | ) | |
| **System, Kansas, Inc.** | ) | |
| **200 SW 30th Street** | ) | |
| **Topeka, Kansas 66611** | ) | |
| | ) | |
| **Principal Place of Business:** | ) | |
| **6500 Sprint Parkway** | ) | |
| **MS:HL-SASTX** | ) | |
| **Overland Park, Kansas 66251** | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT AND JURY TRIAL DEMAND

COMES NOW plaintiff George K. Baum Advisors, LLC (hereinafter "GKB"), by and through its undersigned counsel, and for its Complaint against Defendant Sprint Spectrum, LP hereby states and alleges the following, based upon its investigation and on information and belief:

### The Parties

1.     Plaintiff George K. Baum Advisors, LLC is (and was at times material) a Missouri limited liability company with its principal place of business in Kansas City, Missouri. GKB is an investment banking firm that provides various advisory services to client business enterprises throughout the United States. At times material to plaintiff's Complaint, these services included the provision of advice and support relating to Defendant Sprint Spectrum, LP

forming contractual relationships with rural telephone companies, commonly referred to as rural wireless providers ("RWP").

2.  Defendant Sprint Spectrum, L.P. (hereinafter "Sprint") is (and was at times material) a Delaware limited partnership with its principal place of business in Overland Park, Kansas.  Sprint is generally in the business of providing telecommunications goods and services, including wireless communications, to customers throughout the United States.

## Jurisdiction and Venue

3.  Jurisdiction before this Court is proper and appropriate based upon 28 U.S.C. § 1332, in that the plaintiff and defendants are each citizens and residents of different states and in that the amount in controversy exceeds $75,000.00, exclusive of fees and costs.

4.  Jurisdiction before this Court is further proper and appropriate based upon 28 U.S.C. § 1331, in that plaintiff seeks relief in accordance with federal law.  In particular, plaintiff seeks relief in accordance with FRCP 57 and 28 U.S.C. § 2201-2202, and requests a declaratory judgment that the parties' agreement requires Sprint to indemnify, defend, and hold GKB harmless with respect to any and all litigation arising out of GKB's engagement under its letter agreement of September 7, 2006 with Sprint, which engagement included GKB's efforts to successfully establish a viable and operational Sprint Rural Alliance ("SRA") relationship between Sprint and Crossroads Wireless, Inc.

5.  Venue in this matter is proper in the United States District Court for the District of Kansas (the "District"), in that Sprint maintains its principal place of business within the District and in that the parties have contractually agreed to litigate matters pertaining to GKB's engagement by Sprint (as delineated by the parties' agreement of September 7, 2006) within the District.

**Facts Common to all Counts**

6.      As with all wireless communication carriers, a provider's (such as Sprint) wireless network coverage map (i.e., the geographic areas in which a customer/subscriber can seamlessly make or receive the full range of feature functionality, including wireless calls/transmissions/data under the provider's plans), is critically important to customer satisfaction, customer retention, and customer growth.  Thus, wireless communication companies, such as Sprint, strive to continually increase and upgrade their coverage maps to try and maximize their customer experience and satisfaction.

7.      During the late 1990's, Sprint initiated a program to expand its wireless communications services and coverage map through what became known as the Sprint Rural Alliance Program ("SRA Program").

8.      Pursuant to the SRA Program, Sprint would contract with RWPs, including Incumbent Local Exchange Carriers ("ILECs"), to build out wireless network resources (cell towers and related infrastructure) in the contracting RWPs/ILECs particular locality.  Those network resources could then be used by Sprint's customers through the Strategic Roaming Agreements ("SRA Agreement(s)") between Sprint and the contracting company (such as an RWP/ILEC).

9.      Under the SRA Program, an ILEC would typically earn fees when Sprint customers would use the ILEC's wireless network resources, while Sprint would receive the benefit of expanded network coverage across the United States for its wireless customers through access to the ILEC's network infrastructure.

10.     Through approximately 2005, Sprint sought to implement its SRA Program in a region-by-region manner, whereby Sprint would enter into SRA Agreements with one or more ILECs to establish an increased coverage map and to add additional customers in rural locations.

11.     In furtherance of Sprint's goals, Sprint initially engaged GKB in 2003 to act as its exclusive agent and primary point of contact for ILECs with respect to SRA Agreements. Towards that end, GKB ultimately negotiated and facilitated (during the 2003-2005 timeframe) Sprint's execution of several smaller, but exceedingly successful, SRA Agreements with ILECs in the Midwest.

12.     Given the success of the smaller SRA Agreements that had been previously executed by Sprint (with GKB's assistance), Sprint desired to expedite plans to roll out the SRA concept on a broader and more national scale.

13.     Specifically, upon information and belief, sometime in or around late 2005 or early 2006, Sprint decided to philosophically modify its SRA Program by shifting from essentially a more-patchwork series of SRA Agreements across the United States to a more-nationalized program.  Sprint informed GKB and its agents that Sprint preferred to create a more unified and nationalized SRA structure for a variety of reasons, including that such a structure: allowed Sprint to deal with a single point of contact in implementing technological or network-related changes; reduced administrative burdens on Sprint and created economies of scale; and more effectively used Sprint's internal business development resources.

14.     Under this new nationalized framework for its SRA concept, Sprint sought to enter into an SRA Agreement with a not-yet-formed, singular, and far-larger entity, which Sprint contemplated would undertake the building out of a unified and widespread network in multiple rural areas throughout the lower forty-eight (48) United States.  That larger single SRA

contracting entity, sometimes referred to by Sprint as "SRA Corp.", could then engage and involve multiple regional and/or local RWPs throughout the country, as it deemed appropriate.

15.     In furtherance of Sprint's desire to create a more "nationalized" SRA Program, it engaged and directed GKB in 2006 to not only act as its exclusive agent for targeting and marketing the SRA Program generally and for facilitating the execution of SRA Agreements with RWPs (such as ILECs), but also to specifically address and assist in the successful creation of a "certain to-be-formed RWP, hereinafter referred to as SRA Corp.," which was contemplated by Sprint to involve "approximately six million (6,000,000) SRA Market POPs[2] throughout the lower forty-eight (48) states." This engagement letter agreement ("Agreement") dated September 7, 2006 was signed by Tracy Smith on behalf of GKB and Todd Rowley on behalf of Sprint.

16.     As part of the parties' new and updated engagement Agreement, Sprint agreed to pay GKB a "Success Fee" for facilitating "SRA Corp.'s" creation and development with "necessary rural local telephone ownership interests" across portions of the lower forty-eight states. Sprint agreed to pay this "Success Fee" to GKB on the one-year anniversary of "SRA Corp.'s" execution of an SRA Agreement, provided that "SRA Corp." had obtained the "necessary local rural ownership interests in each of the regional operating entities as stipulated in the SRA Corp. Strategic Roaming Agreement."

17.     Upon information and belief, Sprint consistently in 2006, 2007, and 2008 informed both GKB and third parties, that GKB's actions under the Agreement, taken with respect to the successful establishment and execution of the contemplated SRA Agreement

---

[2] The term "POP", in telecommunications parlance, originally referred to a "point of presence," which generally identified locations where there was an interface between local exchange carriers and other carriers. However, as the wireless telecommunications industry grew and developed, the term "POP" evolved to subsequently describe, as it does in the parties' Agreement, the potential covered population of wireless customers served by a given point of presence area.

between Sprint and "SRA Corp." (the entity that ultimately became Crossroads Wireless, Inc.)

were "for the sole and exclusive benefit of Sprint."

18.    As part of the Agreement between Sprint and GKB dated September 7, 2006,

Sprint further agreed to:

> "indemnify, defend and hold harmless GKB and any of its affiliates (and their
> respective directors, officers, partners, employees, agents and control persons)
> from and against any losses, claims or proceedings, damages, judgments,
> assessments, investigation costs, settlement costs, fines, penalties, arbitration
> awards, other liabilities, costs, fees and expenses (collectively "Losses") (i)
> related to or arising out of any act or omission between Sprint and any RWP, or
> (ii) otherwise related to or arising out of the engagement of GKB under this
> Agreement or related to performance under the Strategic Roaming Agreements or
> conduct in connection therewith . . ."

19.    The contemplated "to-be-formed RWP hereinafter referred to as 'SRA Corp.'"

ultimately became Crossroads Wireless, Inc. ("Crossroads"), which was formed in the fall of

2006.

20.    Pursuant to the parties' Agreement of September 7, 2006, GKB and one of its

Managing Directors, Tracy Smith, began providing services on Sprint's behalf and for Sprint's

benefit to promote and facilitate the execution of an SRA Agreement between Sprint and

Crossroads and to also facilitate the proper capitalization of Crossroads, as contemplated by the

parties' Agreement, by acting as a telecommunications/ILEC subject matter advisor with respect

to Sprint and the SRA program.  GKB and Ms. Smith continued to provide these subject matter

advisory services to Crossroads, with Sprint's knowledge, consent, and approval, during the

course of Crossroads' efforts to pursue appropriate rural ILEC ownership involvement.

21.    With the assistance of GKB and Tracy Smith, Sprint and Crossroads executed

their SRA Agreement in February of 2007.  Upon execution, Sprint was contractually entitled to

receive, and did receive, a substantial "SRA fee" from Crossroads, in accordance with the terms of the SRA Agreement between Sprint and Crossroads.

22.     Further, as part of its efforts to obtain capital and appropriate rural ILEC ownership interests (as prescribed by Sprint's design and goals), Crossroads engaged a number of entities to assist it, as set forth below.

23.     After Sprint first encouraged and provided its consent to an engagement, Crossroads engaged GKB  to act as its subject matter advisor with respect to (a) aspects of the telecommunications industry, (b) acquisition of spectrum licenses, and (c) general assistance during the capitalization process in locating appropriate potential investors (including ILEC investors) and providing those investors with information regarding the Sprint SRA Program/process and Crossroads' anticipated future business operations as part of that SRA Program.

24.     Crossroads additionally engaged Brown Brothers Harriman & Co. to provide capitalization analytics and modeling to facilitate private capital placement for the anticipated Crossroads operations, as well as to assist Crossroads in securing private equity funds and other forms of capital placements.

25.     Finally, Crossroads retained the international law firm of Latham & Watkins, as well as Wilkinson Barker Knauer, to provide legal services and advice during the initial capitalization and start-up process and to prepare necessary documents relating to capital placement opportunities, spectrum acquisition transactions, investment offering documents and related informational materials, as well as Subscription Agreements.

26.     Throughout 2007 and 2008, Crossroads, along with the team it had designated, solicited capital contributions from a variety of types of investors, including private capital

placement from appropriate ILECs, other private equity interests, and debt financing sources such as the Department of Agriculture's Rural Development Utilities Program ("RDUP") loan program, which provided business loans on favorable terms for telecommunications carriers to provide services to rural areas in the United States. These efforts were part of the ambitious business plan/concept that Sprint desired in terms of the national scope of Crossroads. Due to the sheer size of the Crossroads project, substantial amounts of capital (involving projected capital raises of hundreds of millions of dollars) from these various sources were required and contemplated by both Sprint and Crossroads.

27.    While funding of the nature set forth above was readily available when Crossroads was first contemplated and undertaken, financing opportunities quickly "dried up" due to the global economic crisis that emerged during late 2007 or early 2008. Indeed, the financial crisis resulted in widespread harm to the U.S. economy as a whole, and as early as mid-2007, it began to significantly affect the wireless telecommunications markets, the political and regulatory environment in which that industry operated, as well as the opportunities provided for the growth of start up operations aimed at wireless telecommunications networking in the rural areas throughout the United States.

28.    As a result of the capital markets "drying up" and the resulting inability to access necessary funding sources to maintain the vast endeavor undertaken, Crossroads ultimately failed and became insolvent, which precipitated various lawsuits filed by investors, including a multitude of RWPs and ILECs that invested in Crossroads early on in the process. Those matters include the following:

      a.  *McCormack-Missouri Wireless, Inc. v. George K. Baum Advisors, LLC, et al*;
      b.  *Commnet v. George K. Baum Advisors, LLC, et al.*;
      c.  *Salina-Spavinaw v. George K. Baum Advisors, LLC, et al.*; and
      d.  *Arvig Enterprises v. George K. Baum Advisors, LLC.* (Exhibits 1-4).

29.     In each of the matters set forth in paragraph 28, *supra*, the plaintiffs alleged, amongst other things, claims of purported negligence by GKB with respect to the services performed by GKB in facilitating the required capitalization of Crossroads.  Further, each of those matters asserted claims against GKB that relate to Sprint's engagement of GKB under the Agreement of September 7, 2006 as well as to the contemplated SRA Agreement between Crossroads and Sprint.  In particular, the claims relate to GKB's efforts to assist both Sprint and Crossroads in "obtaining the necessary rural local telephone ownership interest" in Crossroads, which was critical to any potential success of Crossroads' SRA Agreement and which would ultimately be of significant benefit to Sprint.  Although GKB has denied, and continues to vigorously deny, the various plaintiffs' claims, the allegations set forth in those matters clearly fall within the purview of the parties' Agreement and, more specifically, Sprint's obligations to hold GKB harmless, as set forth herein, because the claims "relate to or arise out of Sprint's engagement of GKB under the Agreement."

30.     As a direct result of those investor lawsuits, which named GKB and others, GKB has incurred substantial Losses by way of investigation costs, settlement costs, and other fees and expenses attendant to these litigation matters, and those Losses are ongoing in nature, as one or more of those actions remain unresolved.

## Count I

### (Breach of Contract/Contractual Indemnity)

31.     To the extent they are not inconsistent, Plaintiff GKB re-states and re-alleges the allegations set forth in paragraphs 1-30 and incorporates the same by reference, as though fully set forth herein.

32.    As part of the parties' Agreement of September 7, 2006, Sprint contractually agreed to:

> "indemnify, defend and hold harmless GKB and any of its affiliates (and their respective directors, officers, partners, employees, agents and control persons) from and against any losses, claims or proceedings, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards, other liabilities, costs, fees and expenses (collectively "Losses") (i) related to or arising out of any act or omission between Sprint and any RWP, or (ii) otherwise related to or arising out of the engagement of GKB under this Agreement or related to performance under the Strategic Roaming Agreements or conduct in connection therewith . . ."

33.    GKB has complied with and fulfilled all of the terms and conditions, including conditions precedent, required of GKB under the Agreement of September 7, 2006.

34.    The parties' Agreement was supported by good and valuable consideration provided by GKB to Sprint.

35.    GKB has made prior demands of Sprint to satisfy and fulfill its contractual obligations to indemnify and hold GKB harmless in regards to the Losses it has sustained and will sustain in the future relating to the matters set forth in paragraph 28, *supra*.

36.    To date, Sprint has refused to abide by its obligations to provide indemnity and to hold GKB harmless, pursuant to Section 7 of the parties' engagement letter Agreement of September 7, 2006.  Thus, Sprint is in breach of the parties' Agreement and will continue to be in breach, unless and until it fully satisfies its obligations to provide GKB with indemnity as contemplated.

37.    As a direct and proximate result of Sprint's breach of the parties' Agreement, GKB has been damaged in that it has suffered substantial "Losses", as defined under the parties' Agreement, plus interest, and other attorney fees, special, incidental and consequential damages, for a total amount currently unknown but which will be shown at the time of trial.

## Count II

### (Declaratory Judgment)

38.     To the extent they are not inconsistent, Plaintiff re-states and re-alleges the allegations set forth in paragraphs 1 through 37 and incorporates the same by reference, as though fully set forth herein.

39.     GKB further seeks a declaration from the Court regarding the rights, obligations and duties of GKB and Sprint, pursuant to the terms of Section 7 of the parties' engagement letter Agreement dated September 7, 2006.

40.     Specifically, GKB seeks a declaration from the Court as follows:

a.   That GKB's services performed, in facilitating the required capitalization of Crossroads with specific rural local telephone ownership and in facilitating the successful execution of an SRA Agreement between Sprint and Crossroads, were related to or arise out of Sprint's engagement of GKB under the parties' Agreement of September 7, 2006;

b.   That the litigation matters that were commenced against GKB, namely:

   i.   *McCormack-Missouri Wireless, Inc. v. George K. Baum Advisors, LLC, et al*;
   ii.  *Commnet v. George K. Baum Advisors, LLC, et al.*;
   iii. *Salina-Spavinaw v. George K. Baum Advisors, LLC, et al.*; and
   iv.  *Arvig Enterprises v. George K. Baum Advisors, LLC*

all involve allegations that are "otherwise related to or [are] arising out of the engagement of GKB under" the Agreement between GKB and Sprint dated September 7, 2006;

c.   That defendant Sprint is contractually/legally obligated to defend, indemnity, and hold GKB harmless for all Losses sustained by GKB in regards to the

litigation matters set forth in subpart b, *supra,* and is obligated to defend,

indemnify, and hold GKB harmless for any Losses sustained in the future that

relate to either the litigation matters set forth in subpart b, *supra,* or to any

subsequently- commenced actions that have the same operative nucleus of

facts as those generally set forth in the litigation identified in subpart b, *supra.*

WHEREFORE for the foregoing reasons, Plaintiff GKB respectfully requests that the

Court enter judgment in its favor and against Defendant Sprint Spectrum, LP as follows:

1.    Declaring that Sprint Spectrum is legally obligated to defend, indemnify, and hold

GKB harmless for all Losses sustained by GKB or Losses that may be sustained in the future that

are relating to the following matters:

a.    *McCormack-Missouri Wireless, Inc. v. George K. Baum Advisors, LLC, et al;*
b.    *Commnet v. George K. Baum Advisors, LLC, et al.;*
c.    *Salina-Spavinaw v. George K. Baum Advisors, LLC, et al.;*
d.    *Arvig Enterprises v. George K. Baum Advisors, LL; and*
e.    *Any other similar actions that have been filed or may be filed in the future and that relate to Crossroads Wireless, Inc.,*

as such losses relate to and/or arise out of GKB's engagement by defendant Sprint pursuant to

the parties' Agreement of September 7, 2006.

2.    Awarding it a fair and reasonable amount for indemnity for all "Losses" sustained

by GKB that relate to or arise out of GKB's engagement by defendant Sprint pursuant to its

Agreement of September 7, 2006;

3.    Awarding it reasonable attorney fees incurred and expended in obtaining

performance by defendant Sprint of its indemnity obligations under the Agreement of September

7, 2006;

4.    Awarding it prejudgment interest on all amounts expended by GKB;

5.      Awarding post-judgment interest from the date judgment is entered until paid in full; and

6.      Awarding such other and further relief as the Court deems just and proper.

Respectfully submitted,

HORN, AYLWARD, & BANDY, LLC

/s/ K. Christopher Jayaram
Robert A. Horn            KS# 70254
K. Christopher Jayaram    KS# 23123
Horn, Aylward, & Bandy, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
(816) 421-0700
Fax (816) 421-0899
rhorn@hab-law.com
cjayaram@hab-law.com

## DEMAND FOR JURY TRIAL

Plaintiff hereby respectfully requests a trial by jury on all issues so triable.

## DESIGNATION OF PLACE FOR TRIAL

Pursuant to Local Rule 40.2, Plaintiff hereby designates Kansas City, Kansas as the place of trial.

Respectfully Submitted,

HORN, AYLWARD, & BANDY, LLC

   /s/ K. Christopher Jayaram
Robert A. Horn          KS# 70254
K. Christopher Jayaram     KS# 23123
Horn, Aylward, & Bandy, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
(816) 421-0700
Fax (816) 421-0899
rhorn@hab-law.com
cjayaram@hab-law.com