IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


George K. Baum Advisors, L.L.C.,

        Plaintiff,


        vs.                           Case No. 11-2442-JTM


Sprint Spectrum, L.P.,

        Defendant.



MEMORANDUM AND ORDER


In 2006 and 2007, Crossroads Wireless, a local telecommunication company, attempted to acquire sufficient capital to permit it to partner with Sprint Spectrum, L.P., by providing rural roaming services. Pursuant to a contract with Crossroads, plaintiff George K. Baum Advisors (GKBA) helped to market Crossroads to potential investors. After Crossroads failed in 2008, a number of investors sued GKBA alleging fraudulent and negligent misrepresentation. GKBA ultimately settled these actions, and has brought the present action seeking indemnification from Sprint under a separate contract. Both parties have filed motions for summary judgment, and the court finds that the indemnification is not available under the separate Sprint-GKBA contract. Even if such indemnification were authorized under the contract, the court finds that GKBA's marketing involved conduct

which was unlawful under the Securities Exchange Act of 1934, and that Kansas law would preclude indemnifying GKBA for its own illegal conduct.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that

there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## Findings of Fact

The Sprint Strategic Roaming Alliance or Strategic Rural Alliance (SRA), was designed to expand Sprint's wireless coverage footprint in rural areas by entering into agreements with rural telephone companies (telcos). Under its SRA Program, Sprint would contract with rural wireless providers (RWPs) "and engage them to have spectrum that they could use to build out coverage to Sprint's specifications." The Program would allow Sprint to "have arrangements where the customer experience, when they were in those areas that were not owned by Sprint, were built out by these entities, would look and feel virtually the same as if they were in a network area that was actually owned and operated by Sprint or one of its affiliates."

George K. Baum & Co. (GKBC) hired Tracy Smith on November 10, 2003. Under her employment contract, Smith was to receive bonuses based on a set percentage of the fees generated through her engagements.  The same contract provided that Smith would obtain and maintain a Series 7 securities license. It is uncontroverted that Smith never obtained or maintained the license. She was not licensed to offer or sell securities, and was not a

registered investment advisor.

It is unclear who actually employed Smith. Based on the depositions of Smith and Jon Baum, the plaintiff contends that Smith was employed by GKBA. Sprint, on the other hand, has submitted objective evidence in the form of W2 statements showing that Smith was paid by GKBC.

On December 30, 2003 Sprint and George K. Baum Advisors (GKBA) entered into an engagement letter agreement under which GKBA would locate and qualify potential SRA candidates.

Section 1 of this agreement spells out the "Services to be Rendered" by GKBA to Sprint, which included identifying and financially prequalifying prospective candidates, and serving as an exclusive point of contact for candidates proposing and negotiating SRA agreements. GKBA served as Sprint's "exclusive point of contact" between Sprint and RWPs seeking to participate in the SRA.

In the fall of 2005, one potential SRA candidate, Chickasaw Wireless, based in Oklahoma, proposed an SRA Agreement which would cover parts of a five-state territory. On November 21, 2005, GKBA entered into a capital placement engagement letter with Chickasaw.

Section 1 of the GKBA-Chickasaw engagement provides for "Services to be Rendered" by GKBA to Chickasaw. As "Capital Placement Services," GKBA agreed to: (1) develop a list of interested and qualified prospective investors; (2) help Chickasaw in preparing evaluation materials to be used in discussions with investors; (3) arrange

meetings with investors; (4) advise Chickasaw in its discussions with investors and negotiating the timing, structure and pricing of a capital placement; (5) evaluate capital placement transactions proposed by investors; (6) assist in negotiating agreements relating to capital placement; and (7) assist the company with financial issues related to the consummation of a capital placement. On July 25, 2012, Tracy Smith signed an affidavit in which she declared under oath that beginning in 2005 and until late 2008, GKBA performed each of these services

GKBA was Chickasaw's agent with respect to the services performed under the November 21, 2005, capital placement engagement.

From 2003-2005, Sprint pursued an SRA Program that, it envisioned, would include at least 20 to 25 SRA Agreements with RWPs. However, in early 2006, Sprint and another wireless carrier, Alltel, began negotiations for an expanded roaming agreement which would cover a large portion of the SRA footprint which had been targeted by GKBA and Sprint in their 2003 engagement. The Alltel agreement would potentially reduce the geographic area available for GKBA to seek SRA candidates from 25 million Points of Presence (POPs) to 6-7 million. The Alltel agreement would also overlap parts of the SRA territory being proposed by Chickasaw in Kansas, Missouri, Arkansas and Texas.

After the Alltel deal was disclosed to GKBA, Tracy Smith told Sprint that she could not deliver the remaining 6-7 million SRA POPs in separate agreements with rural telephone companies, and proposed covering the remaining POPs with one big rural wireless carrier.

5

On July 27, 2006, Sprint's executive management approved negotiation of a single SRA contract with an entity to be formed by Chickasaw — "SRA Corp." — that would cover the remaining POPs available for SRA coverage in the lower 48 states. "SRA Corp." was ultimately incorporated as "Crossroads Wireless, Inc." in October 2006. According to GKBA, "Chickasaw was the entity that created the idea for Crossroads."

On September 7, 2006, GKBA and Sprint signed a new engagement agreement. Section 1 outlines the GKBA's performance obligations, which included identifying and financially prequalifying prospective SRA candidates and serving as the primary point of contact for candidates proposing and negotiating SRA agreements.

Before entering into the new agreement, Sprint performed an analysis of GKBA's value to Sprint. It concluded that it was more cost effective to use GKBA's services rather than trying to separately negotiate with rural telcos.

Section 1 does not include any statement or reference to any services by GKBA regarding capitalizing SRA Corp., Crossroads or any other entity.

The plaintiff concedes there is no express reference to SRA Corp. or Crossroads, but argues that the engagement could be interpreted that way, in its general provision that GKBA would provide "general business and advisory services." The court finds that this overstates GKBA's responsibilities, as the agreement actually states only that "Sprint acknowledges and accepts that GKBA intends to provide investment banking, capital placement and acquisition advisory services" to SRA Corp. The Agreement carefully *limited* GKBA's responsibilities, providing that "Nothing in this Agreement is intended to obligate

6

or commit [GKBA] or any of its affiliates to provide any services other than as set out above."

Sprint knew that GKBA was later engaged by Crossroads to raise capital, but there is no evidence indicating that it knew of, or approved, the terms of the agreement between GKBA and Crossroads. Sprint knew that Crossroads was a greenfield entity that would require significant capital, including capital from rural telcos.

The Engagement also contains a "merger clause" stating that the Agreement "constitutes the entire agreement, and supersedes all prior agreements and understandings (both written and oral) of the parties hereto with respect to the subject matter hereof, and cannot be amended or otherwise modified except in writing executed by the parties hereto."

Section 6 of the Engagement, titled "Scope of Responsibility" states:

Neither Sprint nor any of its affiliates . . . shall be liable to GKB . . . for any claim, loss, damage, liability, cost or expense suffered by GKB or any other such person arising out of or relating to Sprint's engagement of GKB hereunder except for a claim, loss or expenses that arises from or to the extent that it is based upon any action or failure to act by Sprint . . . .

Section 7, titled "Hold Harmless," provides:

Sprint agrees to indemnify, defend and hold harmless GKB and any of its affiliates... from and against any losses, claims or proceedings, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards, liabilities, costs, fees and expenses (collectively, "Losses") (I) relating to or arising out of any act or omission between Sprint and any RWP, or (ii) otherwise relating to or arising out of the engagement of GKB under this Agreement or related to performance under the Strategic Roaming Agreements or conduct in connection therewith. To the extent that such Losses result from the bad faith, willful misconduct or gross negligence of

GKB in performing the services that are the subject of this Agreement, Sprint shall not be required to indemnify, defend or hold harmless GKB for the Losses.

Section 5, titled "Certain Restrictions," contained restrictions against GKBA providing investment banking services to other wireless carrier or rural wireless providers proposing an SRA relationship with Sprint. Section 5 contained a "carve out" acknowledging GKBA's intent to provide investment banking services to "SRA Corp.":

> Notwithstanding the foregoing, Sprint acknowledges and accepts that GKB intends to provide investment banking, capital placement and acquisition advisory services ... to a certain to-be-formed RWP, hereafter referred to as "SRA Corp", in connection with SRA Corp.'s efforts to pursue the execution and performance of a Strategic Roaming Agreement with Sprint for approximately six million (6,000,000) SRA Market POPs in the lower forty-eight (48) states.

The Engagement contained a "Schedule of Fees" to be paid to GKBA, including an "Initial Engagement Fee" an "Initial Retainer Fee", "Monthly Retainer Fee", "Strategic Roaming Agreement Fee" and a $500,000 "Success Fee." The "Success Fee" was payable to GKB "upon SRA Corp. obtaining the necessary rural telephone ownership interest in each of the regional operating entities as stipulated in the SRA Corp. Strategic Roaming Agreement."

The agreement provided that Crossroads should raise $100 million by May 15, 2007, $150 million by August 31, 2007, $250 million by November 15, 2007, and $800 million by February 15, 2008. The plaintiff also notes that under the agreement, Sprint had the right to approve the RWP investors in Crossroads. However, there is no evidence Sprint was ever asked to approve any investors in Crossroads.

The "Success Fee" created an incentive for GKBA to obtain the requisite rural telecom interest, but the provision did not create any affirmative obligations or requirements on GKBA. Under the "Success Fee" provision, it was not GKBA's responsibility to ensure that "SRA Corp." satisfied its contractual obligation to obtain local telco ownership as mentioned in the SRA Agreement; it was SRA Corp.'s obligation.

These success based-fees, which were based on milestones SRA Corp. had to achieve, were never paid to GKBA.

On December 13, 2006, GKBA entered into a capital placement engagement with Crossroads. GKBA agreed

> to jointly with Brown Brothers Harriman ... serve as the Company's exclusive co-placement agent and co-financial advisor with respect to a possible 'Capital Placement" ... involving qualified lenders ... investors ... or contributing local exchange carriers or other wireless operators ... for the purpose of properly capitalizing the Entities and funding the Company's proposed establishment of an integrated wireless communications operation.

Under Section (1) of this agreement, "Capital Placement" was defined to include

> any purchase or other acquisition of any of the securities of [Crossroads] by any investor or strategic partner, including . . . equity or equity linked securities, as commonly defined, including without limitation common stock, preferred stock, membership interests, and derivatives thereof . . . ('Equity Securities') [and] Capital, in any form, from Strategic Partners that is contributed in exchange for equity or equity linked securities.

Among these "Capital Placement Services" GKBA agreed to provide to Crossroads were: (1) developing a list of prospective lenders, investors or strategic partners that GKBA believed would be interested and financially qualified; (2) assisting Crossroads in preparing evaluation materials containing relevant business and financial aspects of the

company to be utilized in discussions with prospective lenders, investors, or strategic partners; (3) contacting and arranging meetings with prospective lenders, investors, or strategic partners; (4) advising the company as to strategy and tactics for initiating discussions with prospective lenders, investors, or strategic partners and negotiating the timing, structure and pricing of a capital placement and potentially participating in such discussions and negotiations; (5) evaluating capital placement transactions proposed by lenders, investors, or strategic partners; (6) assisting in negotiating agreements relating to capital placement; and (7) assisting the company with financial issues related to the consummation of a capital placement.

Section 3 addressed "Fees for Capital Placement Services." These Fees include a "placement fee" equal to 4.50% of any equity contribution from local exchange carriers or other wireless operators.

GKBA received at least $3 million in capital placement fees from Crossroads under the December 13, 2006 engagement, based on the amount of money invested by rural telcos.

The agreement stated that it did not oblige GKBA to buy any securities from Crossroads or to place them with other entities. Section 7 acknowledged GKBA's separate contract with Sprint:

> [Crossroads] acknowledges that GKB is currently engaged by Sprint ... for the purpose of assisting Sprint in entering into Strategic Roaming Agreements with rural wireless providers and agrees that any actions taken or advice or opinions given by GKB relating to the establishment of a Strategic Roaming Agreement by and between Sprint and [Crossroads] are

for the sole benefit of Sprint. [Crossroads] further acknowledges that it has been made aware of these matters and agrees to waive any and all claims against GKB relating to potential conflicts of interest arising therefrom.

Crossroads employed Latham and Watkins as its securities counsel, and employed broker-dealer Brown Brothers Harriman (BBH) to help raise capital. BBH constructed a financial model for Crossroads, based on inputs from Tom Riley of Crossroads and Tracy Smith of GKBA.

According to the plaintiff, Smith's input was simply "administrative and clerical," but the evidence fails to establish this fact as uncontroverted. There is evidence that Smith reviewed, edited, and commented on information in the Crossroads capitalization tables.

On or about February 15, 2007, Sprint and Crossroads entered into an SRA Agreement with an effective date of February 15, 2007. Section 4.1.3.1 of this agreement required Crossroads, within twelve months, to have sold or transferred a sufficient number of equity interests in the Company such that at least 25% of the outstanding equity interests in the Company would be owned by local telco partners.

Beginning in at least March 2007, GKBA began to distribute a document titled "Investor Information Packet" to potential investors in Crossroads. GKBA distributed these packets on behalf of Crossroads.

At least five versions of the packets were distributed to potential investors. One bore the name and logo of George K. Baum & Company, and on the front cover instructed recipients to "Please direct all inquiries to: Tracy L. Smith, Principal." Subsequent versions contained the name and logo of George K. Baum Advisors, but still instructed recipients

to "Please direct all inquiries to: Tracy L. Smith, Principal." According to Matt Blain, an analyst at GKBA, the packets identified Smith because "she was the one managing the capital raise" from rural telephone companies.

Each of the packets contained a Capitalization Table which stated that a $26 million equity contribution by Chickasaw to Crossroads was "complete" or "funded" in September 2006 or at "opening." However, Chickasaw never made or completed a $26 million equity contribution to Crossroads. An audited balance sheet for Crossroads dated December 31, 2007 showed an equity contribution by Chickasaw of no more than $7 million, and investment in Crossroads of less than $1 million. As of March 31, 2007, Crossroads's total assets consisted of $982 in cash and Crossroads had no assets prior to that time.

The "Capitalization Table" in each of the Investor Information Packets distributed to potential investors in Crossroads contained representations regarding a $56 million loan agreement with the United States Department of Agriculture's Rural Utility Service ("RUS" or "RDUP"). The Capitalization Table in the first version of the Investor Information Packet states that $56 million in RUS debt is "complete."

Crossroads did not have a loan agreement with RUS in the amount of $56 million. Instead, the loan agreement was between RUS and a wholly-owned subsidiary of Chickasaw Wireless known as Poplar PCS. Neither Poplar PCS nor the $56 million RUS loan were ever transferred to Crossroads.

In total $72,853,900 was invested in Crossroads by rural telcos for the purchase of Series A, B and C preferred stock. GKBA invoiced Crossroads at least $3,002,463 for

"capital placement fees" for the sale of Crossroads Series A, B, and C preferred stock. The sale of Crossroads's stock to local telephone companies was the sale of equity securities.

Tracy Smith was the lead person for GKBA, and she solicited investors on behalf of Crossroads. The plaintiff argues that Smith simply served as a "subject-matter expert" on the issue, and has denied that Smith sold or solicited securities. As the court explains more fully below, the plaintiff's evidence fails to support this conclusion. While she may indeed have acted as an expert on the issues, plaintiff's evidence does not controvert the evidence showing that Smith helped to market Crossroads. Smith herself concedes that she gave glowing descriptions of similar opportunities, and the other witnesses cited by GKBA have admitted to lacking any direct knowledge of Smith's role.

The term "subject-matter expert" does not appear to have been used during the marketing of Crossroads, was not used in the GKBA-Crossroads Agreement, and was not revealed to potential investors. Rather, the Agreement describes GKBA as Crossroads's "capital placement agent."

Tracy Smith and GKBA identified and created a list of potential telco investors to whom the investor packets would be sent. They also contacted prospective investors and invited them to meetings. The meeting invitations directed:

> All communications, inquires, and requests for information regarding the Company, or any possible transaction, should be directed to Tracy Smith. Under no circumstances should the management, directors, or any employee of the Company or any of their respective affiliates be contacted directly.

Smith and GKBA attended most or all of the meetings with potential investors and

participated in most of the conference calls. Smith and GKBA also assisted Crossroads in preparing materials to be utilized in discussions with prospective investors.

GKBA authored portions of the Investor Information Packets, and then compiled and put together the packet. Smith and GKBA distributed the investor packets and participated in presentations to telcos that ultimately invested in Crossroads.

Tracy Smith and GKBA communicated with potential investors in person, by email, telephone, fax and letter, and some of those investors ultimately bought stock in Crossroads. Smith and GKBA presented investors with material information. Smith testified that she provided information to potential investors, including what was "the most important thing to them," information about the geographic relationship between the service maps of Sprint and Crossroads.

Smith and GKBA communicated with potential investors regarding the amount and terms of their investment. Smith recommended the Crossroads investment to potential investors and asked them to invest. Sprint supports this factual conclusion with the testimony of Smith herself, as well as two local telco officers who were solicited by her, Dale Jones and Craig Wilbert.

The plaintiff attempts to controvert the last point by suggesting that Smith's deposition indicated only that she observed that current SRAs were doing well, and that Jones had stated simply that Smith had "supported" investment, which GKBA asserts "falls short of recommending" it. (Dkt. 150, at 13).

The court finds the fact is uncontroverted. Asked directly if she had recommended

Crossroads, Smith responded

> I — I didn't work for them [it is unclear in context whether Smith means the potential investors or Crossroads] – for them, but I — I — if — I don't know that I never said if asked, if one of them came up to me and said what I thought. I think my pat answer was, well, *the current SRAs are doing fabulous*. The SRAs that were signed – which they all knew. And, in fact, I would invite them to meetings to talk about their SRAs, and they also provided inputs on their actually — operational metrics that they were achieving. So I believe I would say, well, the current SRAs are doing extremely well.

(Emphasis added). Asked if she ever discouraged any potential investor from buying stock in Crossroads, Smith was far less equivocal, stating simply, "Not that I recall." Smith thus does not disavow making any recommendation, and admits she told investors existing SRAs were "doing fabulous" and "extremely well."

The plaintiff's attempt to limit the effect of Jones's testimony is also without merit. Jones was asked if Smith had recommended Crossroads, and responded that he could not remember "her exact words, *but* ..." (Emphasis added). Jones was then asked if he understood that Smith supported the investment, and he responded, "Oh, absolutely."

Jones was also asked about the purpose of the meetings with Smith, and whether "she was asking Tri-County to invest in Crossroads?" Jones responded: "Yeah. That was the purposes of her being there, I believe."

Finally, it may be noted that plaintiff does not even attempt to find any ambiguity in the testimony of Wilbert, who directly states that Smith solicited his investment, and suggested it was a good investment.

Accordingly, the court finds that Smith contacted rural telephone company officers

with the recommendation that they invest in Crossroads.

Smith and GKBA assisted in negotiating agreements with telcos leading to a capital placement, and distributed term sheets which directed recipients to call Smith if they had any questions, comments or concerns. Smith and GKBA sent subscription documents to be signed by potential investors.

GKBA received the completed and signed subscription documents. GKBA sent invoices to Crossroads investors requesting payments to fund their investment.

Crossroads, as the issuer, filed a Uniform Form D (Notice of Sale of Securities Pursuant to Regulation D) with state securities administrators for the Series B Preferred Offering, identifying George K. Baum & Company and Brown Brothers as parties to be given a commission for the solicitation of purchasers in connection with the sale of securities in the offering.

The Nebraska Department of Banking and Finance questioned the offering of Crossroads's securities in Nebraska and sought information regarding what entity was involved in the offering of such securities. In response, counsel for Crossroads wrote that the offer and sale of securities in Nebraska was made by George K. Baum & Company, not Brown Brothers as had been indicated on the Form D.

Counsel for Crossroads sent correspondence to the Mississippi Secretary of State stating the offer and sale of securities in Mississippi was made by George K. Baum & Company, not Brown Brothers as had been indicated on the Form D.

GKBA has provided evidence in the form of a June 2007 meeting agenda, which lists

16

Tracy Smith, Bob Paige of BBH, and two Sprint employees as scheduled to present at a information meeting. Another agenda indicates that another meeting was scheduled for Nashville, Tennessee. There is, however, nothing at all to indicate who actually appeared, or what was said. There is evidence that Sprint employees attended two informational meetings with potential Crossroads investors. The evidence indicates that the Sprint employees attended for the limited purposes of discussing the SRA program in general, Sprint's coverage strategy, and existing SRA relationships. Sprint employees did not participate in the part of the meeting during which GKBA pitched the Crossroads investment opportunity, nor were they asked to do so.

While some telephone companies purchased Crossroads stock, it was ultimately unable to raise significant capital, and entered bankruptcy in the spring of 2009.

On April 10, 2009, multiple Crossroads investors filed a lawsuit against GKBA and GKBC in the Circuit Court of Jackson County, Missouri, styled *McCormack-Missouri Wireless, et al. v. George K. Baum Advisors, LLC, et al.* On or about March 21, 2010, a Third Amended Petition was filed in the *McCormack-Missouri* lawsuit by fifteen Crossroads investors, asserting claims against GKBA, GKBC, George K. Baum Holdings, Inc., Tracy Smith, Jonathan Baum, five other officers or directors of GKBA, and other defendants. The plaintiffs asserted claims against GKBA, GKBC, Tracy Smith and Jon Baum for fraud and negligent misrepresentation, and against all of the Baum defendants for violations of the Missouri Securities Act, R.S.Mo. § 409.5-509, money had and received, unjust enrichment, and conspiracy. The plaintiffs alleged the Baum defendants made material

17

misrepresentations in order to induce and solicit the plaintiffs' investments in Crossroads, including the following misrepresentations: (1) that Chickasaw Wireless had completed a $26 million equity contribution to Crossroads; (2) that Crossroads had a $56 million loan with RUS or RDUP that was "complete" or "approved."

On September 29, 2009, Crossroads investor Salina-Spavinaw Telephone Company, Inc. filed a lawsuit against GKBA, Tracy Smith, Jonathan Baum, and other non-Baum defendants in the District Court of Tulsa County, Oklahoma. Salina-Spavinaw asserted claims against Tracy Smith and GKBA for fraud and negligent misrepresentation, and against Smith, GKBA, and Jon Baum for violations of the Oklahoma Uniform Securities Act. The plaintiff alleged the Baum defendants made various misrepresentations in order to induce Salina-Spavinaw to invest in Crossroads, including: (1) that Chickasaw Wireless had completed a $26 million equity contribution to Crossroads; (2) that certain amounts of RUS loan debt was either "complete" or "approved" and not "pending;" and (3) that assets of Poplar PCS were to be owned/contributed to Crossroads Wireless but were not.

On September 15, 2010, Crossroads investor Arvig Enterprises filed a lawsuit against GKBC, GKBA, George K. Baum Holdings, Inc. and Tracy Smith in Otter Tail County Minnesota, later removed to the United States District Court for the District of Minnesota. Arvig alleged that Tracy Smith and the Baum corporate defendants violated the Minnesota Securities Act by selling Crossroads securities to Arvig by means of untrue statements of material fact or the omission of material facts. Arvig also asserted a claim against Tracy Smith and the Baum corporate defendants for negligent misrepresentation, alleging that

18

these defendants supplied false information, and made various misrepresentations in order to induce Arvig to invest in Crossroads, including: (1) that Crossroads had closed on PCS spectrum licenses encompassing nearly 8.8 million POPs; (2) that spectrum licenses already acquired by Crossroads included "Poplar PCS Spectrum Licenses;" (3) that Chickasaw had capitalized Crossroads by contributing $26 million of "equity" and that this amount was "funded" and "complete;" (4) that Crossroads had already closed in November 2007 on $9 million of RDUP financing; (5) that as of December 31, 2007 Crossroads total invested capital was $176.8 million.

On March 13, 2009, Commnet Supply, LLC, a supplier to Crossroads, filed a lawsuit against Tracy Smith, GKBA, and other defendants in the District Court of Oklahoma County, Oklahoma. Commnet asserted claims against Tracy Smith and GKBA for promissory estoppel, tortious interference with contract, tortious interference with prospective economic advantage, negligent misrepresentation, and civil conspiracy or aiding and abetting liability. The *Commnet* lawsuit is still pending.

GKBA settled M*icCormack-Missouri* on June 11, 2010 for $ [redacted], *Arvig* on January 19, 2011 for $ [redacted], and *Salina-Spavinaw* on July 19, 2011 for $ [redacted].

On January 18, 2011, five months after settling *McCormack-Missouri*, and only one day before mediation in *Arvig*, GKBA sent a written demand for indemnity to Sprint.

GKBA did not notify Sprint of its intent to seek indemnity until January 2011. Around the time the first investor lawsuit was filed against GKBA, Tracy Smith called Sprint to give a "heads up" that a lawsuit had been filed and told Sprint "don't worry

19

about it, we don't think it's real or has any substance." Smith told Sprint the lawsuits were "a nuisance," and that the lawsuits were "frivolous" and "frustrating."

On June 3, 2009, GKBA demanded that Chickasaw indemnify it for the investor lawsuits pursuant to an indemnity provision in the November 21, 2005 GKB-Chickasaw capital placement engagement.

In *McCormack-Missouri* and *Salina Spavinaw,* GKBA asserted claims against Chickasaw for indemnification. In a sworn discovery response, GKBA stated:

> All claims asserted against GKB Advisors in the instant action or the Underlying Actions relate back to actions taken by GKB Advisors pursuant to the directions provided by Chickasaw Defendants and obligations arising under the certain letters of engagement executed between GKB Advisors or BBH and Chickasaw Defendants.

GKBA confirmed that the sworn discovery responses were true and correct as of January 21, 2013. GKBA also stated that the investors' claims "arose as a result of GKB Advisors' engagement with Chickasaw." It represented:

> [T]he indemnification sought by GKB Advisors is related to settlements and legal fees paid in response to claims made by investors in Crossroads (other than Chickasaw) based on alleged misrepresentations in the Investor Information Packets distributed to investors pursuant to the GKB Advisors Letter Agreements [with Chickasaw].
>
> ....
>
> The plaintiffs' claims in the Underlying Actions each arise 'in connection' or 'as a result of' GKB Advisors engagement with Chickasaw to assists (sic) in its capitalization related to the SRA with Sprint.

GKBA further stated that the investor lawsuits were "in connection with [GKBA's] engagement with Chickasaw Defendants." According to GKBA, "all of [its] actions ... were

performed for the benefit of Crossroads," and that in its spectrum licensing and capital services, "[t]he relationship of the parties was crystal clear: Chickasaw was the principal and GKB Advisors was the agent." GKBA further stated that its engagements with Sprint and Chickasaw were totally separate and independent of one another:

> The evidence is simply undisputed on the point that, in connection with the SRA process, GKB Advisors represented Sprint and only Sprint. Instead, GKB Advisors' engagement with Chickasaw related to totally separate and independent activities: (1) helping it acquire spectrum licenses; and (2) helping it raise capital. That's it.

GKBA is seeking indemnity from Sprint for defense costs and settlement payments (losses) incurred in the four underlying lawsuits. None of the underlying plaintiffs brought a cause of action against GKBA under the Securities Exchange Act, or under any federal securities law.

## Conclusions of Law

### 1. Application of Section 7

The initial question before the court is the correct construction of the Sprint-GKBA Agreement and the effect of its indemnification clause. This court has previously recognized that under Kansas law the proper interpretation of a written contract

> is a question of law and whether an ambiguity exists in a written instrument is a question of law to be decided by the court. Courts should not strain to create an ambiguity where, in common sense, there is none. To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Where a contract is complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the

document, without regard to extrinsic or parole evidence.

*Warkentine v. Salina Public Schools*, 921 F.Supp.2d 1127, 1131 (2013) (citations and internal

quotations omitted). In addressing this issue, parol evidence is inadmissible to the extent

that it attempts to "prove the meaning of a contract that is unambiguous on its face."

*United States v. Ailsworth*, 927 F. Supp. 1438, 1446 (D. Kan. 1996).

Both parties agree their contract is free from ambiguity, but reach markedly different

interpretations. In its motion for partial summary judgment, GKBA argues that Section 7

of the Agreement clearly contemplates that Sprint hold GKBA harmless for any losses

incurred in assisting Crossroads' capitalization program.[1] Sprint, in its motion for summary

judgment, contends that Section 7 contains no such authorization.

In addition, both parties argue that giving effect to the Section cited by their

opponent would render their own preferred Section meaningless. Thus Sprint argues that

GKBA's broad interpretation of Section 7(ii) (that indemnity applies even if Sprint has no

fault at all) would directly conflict with the plain language of Section 6 (Sprint has no

liability "except for a claim, loss or expense that arises [due to] any action ... by Sprint").

(Dkt. 130, at p. 36). GKBA argues that if the indemnification rights offered in Section 7 is

interpreted to incorporate the requirement of fault by Sprint, then Section 7(ii) is

---

[1] GKBA's partial summary judgment motion addresses only the threshold question of the application of Section 7's indemnification provision. The motion does not address additional defenses asserted by Sprint, including whether the misconduct cited in the state securities claims involved bad faith, wilful misconduct, or gross negligence by GKBA, whether GKBA settled those suits in bad faith, and whether GKBA gave reasonable notice of the actions and settlements to Sprint.

superfluous since Section 7(i) already provides for indemnity. (Dkt. 150, at 30).

The court finds neither argument is dispositive. Section 6 applies to lawsuits directly between the parties. Section 7, dealing explicitly with indemnification, is properly the controlling provision governing GKBA's claims for its settlement of third party litigation. At the same time, as addressed below, the court's construction of the Agreement does not eliminate any clause in Section 7, since that provision is restricted to losses incurred by GKBA for services required under the Agreement, and not additional responsibilities voluntarily undertaken by GKBA on behalf of Crossroads. The Sprint-GKBA contract did not obligate GKBA to help Crossroads meet the 25% contract, it only required SRA/Crossroads to meet that goal. Read as a whole, the contract is unambiguous, and offers no indemnification under the facts of the case.

Citing general indemnity cases involving "arising from" language, GKBA argues that it need only show a general relationship to the Sprint contract. *See, e.g., Pestock v. State Farm Auto Ins. Co.*, 674 P.2d 1062, 1063 (Kan. App. 1984); *Missouri Pac. RR v. Kansas Gas & Elec. Co.*, 862 F.2d 796, 799 (10th Cir. (Kan.) 1988) (citing *Fontenot v. Mesa Petroleum*, 791 F.2d 1207, 1214 (5th Cir. 1986)). GKBA argues that this standard is met here, because its contract with Sprint provided an incentive, in the form of the Success Fee that was payable when Crossroads reached a certain capitalization. In addition, it contends that its contract with Sprint called for it to act as Sprint's primary point of contact. And it cites an extensive portion of the deposition testimony of a former Sprint executive as to what Sprint and GKBA meant in their plans for Crossroads and SRA Corp. (Dkt. 129, at 14-16).

However, while Section 7 does have broad "arising" language typical of ordinary indemnity agreements, it still is grounded on the Sprint-GKBA contract. Section 7 indemnifies GKBA for losses "relating to or arising out of *the engagement of GKB under this Agreement* or related to performance under the Strategic Roaming Agreements or conduct in connection therewith."[2] (Emphasis added). In addition, the indemnification clause further provides that there will be no indemnification for losses which arise due to "the bad faith, willful misconduct or gross negligence of GKB *in performing the services that are the subject of this Agreement*." (Emphasis added).

The court finds no ambiguity in the contract, which provides for indemnity only for those acts by GKBA performing services that were "the subject" of the Sprint-GKBA contract, that is, if the actions of GKBA arose from its "engagement" with Sprint. An "engagement" means "[a] contract or agreement characterized by exchange of mutual promises." BLACK'S LAW DICTIONARY. *See, e.g., Oppenheimer v. Harriman nat. Bank & Trust,* 301 U.S. 206, 213 (1937) (recognizing in construction of banking statute that "all pecuniary liabilities and obligations of the bank ... is a well-recognized meaning of the word 'engagement'").

Accordingly, the court construes and gives effect to the entire contract, and concludes that indemnification is supported when the conduct arises from GKBA's engagement under the contract, or its performance of services were subject to that

---

[2] GKBA has not asserted that the losses arose out of or in connection with any Roaming Agreement.

agreement. The Sprint-GKBA contract did not contain mutual promises as to the GKBA's actions in marketing Crossroad's stock to local telcos. GKBA did not *oblige* itself to helping Crossroads/Chickasaw raise capital, and Sprint did not promise to pay for such efforts.

As GKBA repeatedly admitted in the state securities litigation, the actions cited by the plaintiffs in those cases were taken pursuant to its contract with Chickasaw, not its contract with Sprint. In the words of GKBA, its actions on behalf of Chickasaw-Crossroads, "(1) helping it acquire spectrum licenses; and (2) helping it raise capital" were "totally separate and independent activities" from its obligations to Sprint.

The Sprint-GKBA agreement permitted those activities, it did not require them. Towards that end, it authorized a success fee which was triggered when the new SRA Corp. obtained the necessary capitalization, but this obligation belonged to SRA Corp., not GKBA. And while the 2006 agreement between Sprint and GKBA provided that the latter was a "point of contact," this explicitly applied only to rural telephone companies seeking new SRA agreements with Sprint. In sum, GKBA's solicitation of investments in Crossroads was not an obligation of its contract with Sprint, but an activity it assumed voluntarily for independent consideration from Chickasaw-Crossroads.

Moreover, not only does the Sprint-GKBA contract fail to indicate affirmatively that such activities are covered under Section 7, the court finds that GKBA fails to meet the additional standard of clarity required under Kansas law for parties seeking indemnity for one's own fault. Under Kansas law, agreements in which one party agrees to indemnify another for the indemnitee's own negligence or wrongful conduct are disfavored.

Contractual language in such cases is "strictly construed against the party relying on them," and the intent to indemnify must be expressed in "clear and unequivocal language." *Zenda Grain & Supply v. Farmland Indus.*, 20 Kan.App.2d 728, 732-33, 894 P.2d 881 (1995). *See also Cason v. Geis Irrigation*, 211 Kan. 406, Syl. ¶ 1, 507 P.2d 295 (1973). "Exculpation of liability for one's own negligence is subject to strict construction and expression by clear and unequivocal language." *Elite Professionals v. Carrier Corp.*, 16 Kan.App.2d 625, Syl. ¶ 3, 827 P.2d 1195 (1992).

In *Butters v. Consolidated Transfer & Warehouse*, 212 Kan. 284, Syl ¶ 2, 510 P.2d 1269 (1973, the Kansas Supreme Court wrote:

> It is a general rule that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from his own negligent acts unless such intention is expressed in clear and unequivocal terms, or unless no other meaning can be ascribed thereto, and mere general broad and seemingly all-inclusive language in the indemnifying agreement is not sufficient to impose liability for the indemnitee's own negligence.

In response to Sprint's argument, the plaintiff relies on the decision of the Tenth Circuit in *Neustrom v. Union Pacific Railway*, 156 F.3d 1057 (10th Cir. 1998). In *Neustrom*, the court gave effect to an indemnification clause in an agreement between a railroad and a defoliant-spraying contractor. The agreement at issued contained a broad general indemnification clause, with an exception: "However, the Contractor shall not indemnify the Railroad Company when the loss is caused by the sole negligence of the Railroad Company." The court reasoned this exception defeated the contractor's argument that no indemnification should be required under Kansas law, observing:

The "sole negligence" provision carves out from the otherwise inclusive indemnification the lone circumstance where the indemnity clause does not apply, and that is when the injury or death was caused solely by Union Pacific's negligence. This shows that the parties clearly focused on negligence, including Union Pacific's negligence. The "sole negligence" phrase directly implies that all other kinds of negligence, e.g., joint negligence, are included within the meaning of the phrase "any and all liability, loss, damages, claims, demands, costs and expenses of whatsoever nature." Any other reading would make the "sole negligence" language of the clause meaningless and superfluous.

156 F.3d at 1063 (footnote omitted).

GKBA stresses that the last sentence of Section 7 here provides:

To the extent that such Losses result from the bad faith, willful misconduct or gross negligence of GKB in performing the services that are the subject of this Agreement, Sprint shall not be required to indemnity, defend or hold harmless GKB for the Losses.

According to GKBA, this implies that other forms of misconduct by GKBA do fall within the indemnification requirement.

The court finds that *Neustrom* is not controlling here. First, as that court stressed, the broad indemnification clause at issue there, with its inclusion of all losses "of whatsoever nature," was unambiguously broad, and "otherwise inclusive" of all forms of fault. 156 F.3d at 1063. Given such language, to read the indemnity as precluding claims for joint negligence would render the "sole negligence" carve-out meaningless.

In contrast, in the present action it is not unambiguously clear that GKBA's conduct otherwise falls within Section 7. As noted above. Section 7 provides that the obligation to indemnify GKBA arises for GKBA's actions performing services "that are the subject of this contract," that is, the Sprint-GKBA contract. Here, the capital-marketing services which

created GKBA's liability in the state actions were those pursuant to an entirely separate contract with an entirely different party. Those services were permitted by, but not required by the Sprint-GKBA contact, and certainly were not the "subject" of the contract.

Second, as the Tenth Circuit noted, the use of term "sole negligence" demonstrated that the "the parties clearly focused on negligence," the particular form of fault at issue in the underlying claim. Here, there is nothing in Section 7 which would demonstrate that Sprint and GKBA actively considered negligent misrepresentations by GKBA in performing actions on behalf of Crossroads.

Finally, the Kansas public policy against indemnification for one's own fault was minimized in *Neustrom* because the underlying action by the injured railroad worker asserted fault by *both* the railroad *and* the contractor. In the present case, by contrast, there is no suggestion whatsoever of fault on the part of Sprint.

Given Kansas public policy, the party seeking indemnification for its own negligence must point to something more than "broad and seemingly all-inclusive language" which typifies standard indemnification language. *Zenda Grain*, 894 P.2d at 887 (quotation omitted). The indemnification clause must "express[] in clear and unequivocal terms an intent to shield [the indemnitee] from the responsibility for its own negligence." Id. at 888.

The *Zenda Grain* court cited *Corral v. Rollins Protective Services*, 240 Kan. 678, 732 P.2d 1260, 1263 (1987) as illustrative of the language necessary to overcome the judicial disfavor of indemnification for one's own fault. In *Corral*, the Kansas Supreme Court enforced a limitation of liability clause which restricted the exposure of Rollins, a fire alarm company,

"irrespective of cause or origin, results, directly or indirectly to persons or property from performance or nonperformance of obligations imposed by this Agreement *or from negligence, active or otherwise, of Rollins*." 240 Kan. at 680-81 (emphasis added). A party seeking indemnification for its own fault must demonstrate an equivalent level of certainty. *See Zenda Grain,* 894 P.2d at 888. ("to protect itself from its own negligence, malfeasance, or mismanagement, an entity must employ language similar to the clause in *Corral*").

GKBA seeks indemnification from Sprint for actions which, by its own admission, were "totally separate and independent" from its objections to Sprint. Its argument for indemnification rests on a series of inferences which is not supported in the language of the contract; thus the claim would fail even if GKBA was without fault in the underlying actions. Because GKBA seeks indemnification for its own misconduct, a higher standard applies, and even "seemingly all-inclusive language" is insufficient. Certainly the Sprint-GKBA contract contains no language comparable to *Corral* which expressly states that Sprint will pay GKBA losses caused by GKBA's own negligence. The court finds that Sprint is not obliged to indemnify GKBA for the consequences of its separate and independent capital raising activities.

## 2. Indemnification and Public Policy

Sprint argues that even if Section 7 were otherwise construed to cover GKBA's losses in the state securities litigation, indemnity should be barred under Kansas public policy. That is, it contends that no indemnification is appropriate because, in marketing the

Crossroads stock, Smith was selling securities without registering as a broker, and thus she and GKBA were acting illegally and in violation of Section 15(a)(1) of the Securities Exchange Act of 1934. The Exchange Act requires all persons acting as brokers to register with the SEC. 15 U.S.C. § 78o(a)(1). In turn, a broker is defined as anyone "engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). Sprint argues that courts have generally refused to permit indemnification for losses caused by illegal conduct. *See Wilshire Oil v. Riffe*, 409 F.2d 1277, 1283 (10th Cir. 1969).

GKBA argues that the Sprint's public policy argument can have no application here because it is not seeking indemnification for losses caused by violations of the Exchange Act. In addition, it argues factually that it did not violate the Exchange Act because it was not selling or effecting transactions in securities and thus was not a broker. This issue, it argues is "inherently fact-intensive," and is inappropriate for summary judgment given its contention that Smith and GKBA acted only as the "subject-matter expert" as a "member of Crossroads' larger 'team.'" (Dkt. 150, at 42). GKBA also argues that the federal policy precluding indemnification applies only against intentional or reckless conduct, and thus cannot affect the present action for indemnification under Kansas law.[3] Finally, stressing that a violation of Section 15(a) of the Exchange Act contains no *scienter* requirement,

---

[3] GKBA argues that Sprint "inaccurately states Kansas law, because illegal conduct would necessarily include negligent conduct, and even Sprint acknowledges that Kansas law allows a party to receive indemnity for its own negligence." (Dkt. 150, at 47). GKBA provides no authority for its equating negligence with illegality, and it may be that GKBA here means "might' or "could" rather than "would necessarily." As indicated below, Sprint accurately states Kansas law.

GKBA argues that the federal policy precluding indemnity is limited, and has no application where the underlying violation involves simple negligence.

The court rejects each of these arguments. First, the court finds that Smith and GKBA were engaged in the sale of securities, and accordingly that Smith's failure to register as a broker violated Section 15(a) of the Exchange Act.[4] Under 15 U.S.C. § 78c(a)(4), the term "broker" is defined as "any person engaged in the business of effecting transactions in securities for the account of others." The determination of whether a specific individual is a broker is fact-intensive. *See Sun River Energy v. Nelson*, 2013 WL 1222391, *5 (D. Col. 2013). Nevertheless, in an appropriate case, summary judgment may be granted determining that a person has acted as a broker for purposes of § 78c. *See SEC v. George*, 426 F.3d 786 (6th Cir. 2005) (affirming summary judgment in favor of the SEC in a civil-enforcement action).

In determining whether a person has acted as a "broker" for purposes of the Exchange Act, courts consider a number of factors, including whether the defendant

> (1) actively solicited investors, (2) advised investors as to the merits of an investment, (3) acted with a certain regularity of participation in securities transactions, (4) received commissions or transaction-based remuneration, (5) worked as an employee of the issuer, and (6) sold securities of other

---

[4] Sprint also argues that GKBA's involvement in selling securities is independently demonstrated by its admission that, absent the settlements, it would likely have been found liable in the state securities litigation. According to Sprint, the sale of securities is an essential element in each of the respective state securities statute. GKBA has filed a surreply asserting that the relevant statutes do not necessarily require proof of the sale of a security. The court need not resolve the issue because it determines that the uncontroverted facts otherwise clearly establish that GKBA did participate in the sale of securities for purposes of the Exchange Act.

issuers, may support the conclusion that a person acted as a broker.

*SEC v. Sky Way Global*, 2010 WL 50508509, *1 (M.D. Fla. 2010) (citations, internal quotations omitted).

The definition of "broker" employed by § 78c(a)(4) is broad, and includes acts which generally serve to encourage investors to purchase securities. *See George*, 426 F.3d at 793-94 (6th Cir. 2005) (defendant who regularly and actively "encouraged people to invest" in securities was a broker, even though not directly employed by seller); *SEC v. Deyon*, 977 F.Supp. 510 (D. Me. 1997) *aff'd*, 201 F.3d 428 (1st Cir. 1998) (defendants "actively sought to effect securities transactions" and thus were brokers when they "solicited investors by phone and in person" and "distributed documents and ... sales circulars in the hope that potential investors would deposit their money"); *In re Kemprowski & the Cambridge Consulting Co.*, Exchange Act Release No. 34–35058,1994 WL 684628 (Dec. 8, 1994) (defendants ostensibly employed as "independent consultants" for "public relations" services" were brokers where they "contacted potential investors directly and through registered representatives at registered broker-dealers, and recommended that potential investors purchase Astro stock").

The uncontroverted facts establish that GKBA entered into a capital placement engagement with Crossroads, under which it agreed to act (along with Brown Brothers Harriman) as a "co-placement agent and co-financial advisor with respect to a possible 'Capital Placement'" with the goal of "funding the Company's proposed establishment of an integrated wireless communications operation," including helping with the "purchase

or other acquisition of any of [Crossroads's] securities." GKBA agreed to identify prospective lenders and investors, arrange for meetings with them, and help with the resulting negotiations. In exchange, GKBA received over $3 million in fees for its services, fees which were calculated on the basis of the 4.5% of the investments it obtained.

In fulfilling these obligations, GKBA began to distribute investor information packets, of which it prepared five different versions. The initial version of this packet carried the name of "George K. Baum & Company" on the front cover; later versions identify "George K. Baum Advisors." Both versions direct inquiries to "Tracy L. Smith, Principal." Tracy Smith was listed as the contact person because "she was the one managing the capital raise."

The information packets contained a "Capitalization Table" stating that Chickasaw's $26 million equity contribution was "complete" or "funded" in September 2006, when in fact Chickasaw never made or completed that contribution. The balance sheet for December 31, 2007 showed that Chickasaw had contributed less than $7 million. The packets also claimed that Crossroads held a $56 million loan agreement with the United States Department of Agriculture's Rural Utility Service, which was untrue.

Rural telcos invested nearly $73 million in Crossroads, and GKBA invoiced Crossroads at least $3,002,463 for "capital placement fees" in connection with the sale of Crossroads Series A, B, and C preferred stock. The sale of Crossroads's stock to local telcos was the sale of equity securities.

The uncontroverted facts establish that Tracy Smith was the lead person from GKBA

in soliciting investors for Crossroads, and that Smith solicited investors on behalf of Crossroads.

GKBA and Smith identified and created a list of potential investors, and contacted prospective telco investors and invited them to meetings about Crossroads. Invitees were instructed that

> All communications, inquiries, and requests for information regarding the Company, or any possible transaction, should be directed to Tracy Smith. Under no circumstances should the management, directors, or any employee of the Company or any of their respective affiliates be contacted directly.

GKBA and Smith attended most or all of the meetings with potential investors and participated in most of the conference calls, aided Crossroads in preparing materials to be utilized in discussions with investors, and distributed the packets. They also presented investors with information that was material and important to their decision to invest in Crossroads, and communicated with potential investors in person, by email, telephone, fax and letter, and discussed the amount and terms of their proposed investment. Smith recommended the Crossroads investment to potential investors and asked them to invest. Smith and GKBA assisted in negotiating agreements with telcos leading to a capital placement, distributed term sheets to potential investors and directed recipients to call Smith if they had any questions, comments or concerns regarding the content of the terms sheets. Smith and GKBA sent subscription documents to be signed by potential investors. GKBA received the completed and signed subscription documents, and sent invoices to Crossroads investors requesting payments to fund their investment.

Crossroads, as the issuer, prepared official documents which formally name George K. Baum & Company and Brown Brothers as parties to be given a commission for the solicitation of purchasers in connection with the sale of securities in the offering. Counsel for Crossroads later specifically and formally represented that George K. Baum & Company, not Brown Brothers, was the party involved in the sale of its securities.

Based upon the uncontroverted facts, the court concludes that Smith and GKBA were engaged in the sale of securities for purposes of the Exchange Act. Similarly, the court finds that GKBA's contention that Smith could not be a broker because she was a "subject-matter expert" is without merit. GKBA cites no authority for the proposition that a "subject-matter expert" is mutually exclusive to the term "broker," as if a person may be either but not both.[5]

GKBA does argue that one of Sprint's experts, Bryan Mick, has testified to the effect that "whether the a party engaged in the sale or solicitation of the sale of securities 'can be a grey area.'" (Dkt. 150, at 42, 50). But while the conclusion in a given case "can be" uncertain, that does not mean it always is. While GKBA merely references Mick's testimony in the argument portion of its Response, it does not independently cite to or present that testimony to the court, nor does it indicate whether Mick ultimately agrees that Smith's actions fall within that "grey area."

The plaintiff also points to testimony by Jon Baum, Ken Lund, and Smith herself, but

---

[5] Although not a lawyer, the Bard recognized that it is substance, not a name, that is significant: "What's in a name? That which we call a Rose By any other name would smell as sweet." Romeo and Juliet, Act II, scene ii, line 43.

the court finds that GKBA has failed to demonstrate a factual controversy. Smith does repeatedly state she was a "subject matter expert," but (as noted earlier) the cited testimony otherwise does not disagree with the direct testimony of Crossroads investors who have stated that Smith contacted them for the purpose of recommending the investment. Asked directly, Smith refused to state that she did not recommend Crossroads. Rather, she admitted that she told investors that similar opportunities were "fabulous."

The other witnesses cited by GKBA similarly portray Smith as a "subject matter expert," but this testimony suffers from two flaws. First, those witnesses admit to having no independent knowledge of what Smith told investors, they were simply repeating what Smith told them. More importantly, as indicated above, Smith's status as a "subject-matter expert" does not preclude her acting as a broker for purposes of the Exchange Act.[6]

Next, the court rejects the plaintiff's contention that Sprint's public policy argument is inapplicable because the underlying securities actions were restricted to state blue sky laws, and asserted no claim under the Exchange Act. The public policy defense remains appropriate because GKBA asserts a claim for indemnification under Kansas law, and Kansas public precludes such a claim for illegal conduct. *See Herrman v. Folkerts*, 202 Kan. 116, 120, 446 P.2d 834 (1968) ("an insurance policy is void as against public policy if its

---

[6] The same result holds true for GKBA's argument that it could not have sold securities, because it was merely "a member of Crossroads' larger 'team,'" which included an investment banking firm and outside counsel. (Dkt. 150, at 42). But Section 15(a)'s definition of a "broker" is deliberately broad, *SEC v. Aronson*, No. 11-7033, *7 (S.D.N.Y. Aug. 6, 2013), and GKBA cites no authority for the proposition that a person who otherwise engages in selling a security is excluded from the statute because he or she is a part of a larger "team."

intent is to indemnify the insured against liability for his criminal acts"); *Loscher v. Hudson*, 39 Kan.App.2d 417, 182 P.3d 25 (2008) (indemnity against the consequences of an illegal act is invalid); *Thomas v. Benchmarck*, 36 Kan.App.2d 409, 446-47, 140 P.3d 438 (2006) (under Kansas law, "an insurance policy violates public policy and is, therefore, void if it is intended to indemnify an insured against liability for his or her criminal acts"). *See also Seiffer v. Topsy's Intern., Inc.*, 487 F.Supp. 653, 708 (D. Kan. 1980) (noting that under federal securities law "one cannot insure himself against his own reckless, willful or criminal misconduct"). Acting as a broker in the sale of securities without registration is unlawful conduct. *SEC v. Martino*, 255 F.Supp2d. 268, 283 (S.D.N.Y. 2003).

Kansas law provides that "contracts in contravention of public policy are void and unenforceable" *Loscher,* 39 Kan.App.2d at 429, 182 P.3d at 35. Here, GKBA's actions in marketing the Crossroads securities without registration was illegal and contrary to public policy. Even though the same actions may have given rise to claims for negligence, those claims are grounded in underlying unlawful conduct, and indemnification is contrary to public policy. Because the indemnification claim is grounded in the same nexus of fact as the states securities actions, i.e., GKBA's marketing of the Crossroads securities, the court finds that indemnification is not supported under Kansas law.

Finally, the court rejects GKBA's argument that federal policy is not implicated when the underlying securities violations involve simple negligence. Of the cases cited by

plaintiff,[7] *Globus v. Law Research* merely expresses a general rule that "one cannot insure

himself against his own reckless, wilful or criminal misconduct." 418 F.2d at 1288. The case

is otherwise explicitly dicta, with the court taking care to stress that "it is important to

emphasize at the outset that at this time we consider only the case where the underwriter

has committed a sin graver than ordinary negligence." *Id.[8]*

---

[7] *Globus v. Law Research Serv.*, 418 F.2d 1276, 1288 (2d Cir. 1969); *Maryville Academy v. Loeb Rhoades & Co*, 530 F.Supp. 1061, 1070 (D. Ill. 1981), *Cambridge Fund v. Abella*, 501 F. Supp. 598, 618 (S.D.N.Y. 1980); *In re Olympia Brewing Co. Securities Litigation*, 674 F.Supp. 597 (N.D. Ill. 1987).

[8] In fact, the court's reasoning in *Globus* supports the conclusion that claims tied to a negligent failure to register as a broker under Section 15(a) of the Exchange Act are not subject to indemnification. In finding that the underwriter seeking indemnity from the issuer, who had actual knowledge of material false statements, could not obtain indemnification, the court observed:

> Civil liability under section 11 [of the 1933 Act, 15 U.S.C. § 77k,] and similar provisions was designed not so much to compensate the defrauded purchaser as to promote enforcement of the Act and to deter negligence by providing a penalty for those who fail in their duties.... Thus, what Professor Loss terms the '*in terrorem* effect' of civil liability, 3 Loss, [Securities Regulation,] 1831 [(1969)], might well be thwarted if underwriters were free to pass their liability on to the issuer.... Cases upholding indemnity for negligence in other fields are not necessarily apposite. The goal in such cases is to compensate the injured party. But the Securities Act is more concerned with prevention than cure.

418 F.2d at 1288-89. The regulatory function of Section 15(a) is similar, acting as a "safeguard of the public interest ... integrally linked with Section 15(b) of the Act, and together they form part of the regulatory scheme for the long-range protection of investors." *Blaise D'Antoni & Assoc. v. SEC*, 290 F.2d 688, 689 (5th Cir. 1961). *See also Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357, 362 (5th Cir.) (the requirement of broker registration under Section 15(a) "is of the utmost importance in effecting the purposes of the Act"), *cert. denied*, 393 U.S. 913 (1968); *Celsion Corp. v. Stearns Management*, 157 F.Supp.2d 942, 947 (N.D.Ill. 2001) (all provisions of the 1934 Act serve the common purpose of avoiding market manipulation, and Section 15(a) both

*Cambridge Fund* only recognizes the general rule that there is no indemnification for intentional or reckless securities violations, and does not directly address whether such a claim is available for negligent violations. *Olympia Brewing* similarly cites the general rule that indemnification is not available for persons who intentionally violate securities laws (language which GKBA quotes), but then explicitly observes that "the courts have differing views on whether indemnity is available if the defendant's liability is based solely on negligence," and indeed ultimately concludes that the defendant in that action was *not* entitled to indemnity for mere negligence, in part because "[a]lowing a brokerage firm to avoid secondary liability merely by showing ignorance would contravene the congressional intent to protect the public." 674 F.Supp. at 613. Similarly, while *Maryville* does cite the general rule, it also explicitly recognizes the numerous post-*Globus* decisions precluding indemnification for negligence claims.[9]

The court is persuaded that federal law precludes indemnification for violations of Section 15(a), even if the underlying action does not assert intentional misconduct. In *Eichenoltz v. Brennan*, 52 F.3d 478, 484-85 (5th Cir. 1995), the court directly held that indemnification was not available for losses due to claims asserting the negligent violation of securities laws. The court concluded:

> The public depends upon an underwriter's investigation and opinion, and it relies on such opinions when investing. Denying claims for indemnification

"enforce[s] discipline over those who may engage in the securities business and ... establishes necessary standards with respect to training, experience, and records").

[9] GKBA fails to note these portions of *Olympia Brewing* and *Maryville* in its brief.

would encourage underwriters to exhibit the degree of reasonable care required by the 1933 and 1934 Acts.

*Id.* at 485.

In *Gould v. American-Hawaiian Steamship Co.*, 387 F.Supp. 163, 167 (D. Del. 1974), the court stressed that cases which had permitted indemnity involved claims arising under Sections 10(b) or 17(a), and thus merely stood for the proposition that "one joint tortfeasor whose conduct has been of limited culpability should be entitled to shift his loss to another joint tortfeasor whose conduct has been deliberately fraudulent." The court refused to permit indemnification alleging negligent misconduct arising under Section 14(a), with its broad remedial purpose and which "reaches negligent as well as deliberately deceptive conduct."[10] *Id.* at 168 Thus, "[t]o allow indemnity to those who have breached responsibilities squarely placed upon them by the statute would vitiate the remedial purposes" of the statute. *Id.*

Other courts have reached similar conclusions. *See Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672, 676 (9th Cir.1980) ("permitting indemnity would undermine the statutory purpose of assuring diligent performance of duty and deterring negligence"); *Odette v. Shearson, Hammill & Co.*, 394 F.Supp. 946, 956 (S.D.N.Y.1975) (finding that "the public policy objections to indemnification" cited in *Globus* were "broad enough to cover negligent misconduct" under Section 12(2) of the 1933 Act, 15 U.S.C. § 77l(2));

---

[10] Similarly, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a), prohibits the sale of securities by an unregistered broker, regardless of *scienter*. *SEC v. Randy*, 38 F.Supp.2d 657, 668 (N.D.Ill. 1999).

*Adalman v. Baker, Watts, & Co.*, 599 F.Supp. 752, 755 (D.Md.1984), (indemnification permitted only if shifting loss to a partly who is "significantly more liable"), *aff'd in part and rev'd in part on other gds.*, 807 F.2d 359 (4th Cir.1986); *In re Crazy Eddie Sec. Litig.*, 740 F.Supp. 149, 151 (E.D.N.Y.1990) (following *Adalman* and dismissing indemnification claim by negligent accounting firm against third party defendants).

Kansas law precludes enforcement of agreements which would give indemnity for the commission of illegal acts, or which would contravene public policy. *Loscher*, 39 Kan. App.2d at 428-29. Here, the underlying actions of GKBA in marketing Crossroads reflect conduct which was illegal under federal securities law, and indemnification for such conduct is contrary to federal public policy. The court finds that GKBA may not obtain indemnification from Sprint under the facts of the case..

IT IS ACCORDINGLY ORDERED this 21st day of October, 2013, that the plaintiff's Motion for Partial Summary Judgment (Dkt. 124) is denied: the defendant's Motion for Summary Judgment (Dkt. 122) is granted

       s/ J. Thomas Marten
       J. THOMAS MARTEN, JUDGE